UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE NO. 97-3186-CIV-SEITZ

JIM GALL AUCTIONEERS, INC.,

    Plaintiff,

v.

CITY OF CORAL GABLES,

    Defendant.

_____/

FILED by \_\_\_\_ D.C.

MAY = 5 1999

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon the Plaintiff's Motion for Partial Summary Judgment [D.E. No. 42], and Defendant's Motion for Final Summary Judgment [D.E. No. 39], both filed March 5, 1999.

### BACKGROUND

Plaintiff, Jim Gall Auctioneers, Inc. ("Gall"), is a real estate broker and auctioneer. As part of its business, Gall auctions off real estate and/or personal property. In order to make the real property appear more attractive to potential bidders, Gall generally brings in other vendors to decorate the premises, and then auctions off those vendors' merchandise along with the homeowner's property. The auctions are advertised, in part, through signs placed on the premises to be auctioned. The actual auctions are generally held on the homeowner's property.

In its Complaint, Gall asserts that the Defendant, the City of Coral Gables ("City"), violated Gall's First Amendment rights when it sanctioned Gall for the advertising and conducting of auctions in the City's residential areas. Specifically, Gall asserts that the City unconstitutionally

prohibited auctions in residential areas, and issued citations to Gall for signs and brochures advertising the auctions.[1] The parties have filed cross-motions for summary judgment on the issue of the City's liability. Based upon the undisputed material facts and the reasons set out below, the Court finds that summary judgment in favor of the City is warranted, and that Gall's motion should be denied, because the restrictions at issue here do not offend the First Amendment.

## UNDISPUTED MATERIAL FACTS

The Court finds that the following material facts are not in dispute:

1. Plaintiff, Gall, is a for-profit corporation organized and existing under the laws of the State of Florida. Gall is a licensed real estate broker and auctioneer, although he does not do "traditional type brokerage, where we would put something in a Multi-List; we only auction." Gall auctions mainly real estate, but also personal property, throughout the state of Florida.

2. Defendant, the City of Coral Gables, Florida, a municipality, is a political subdivision of the State of Florida, located in Dade County, and is a "person" within the meaning of 42 U.S.C. § 1983.

3. The City's zoning code was enacted to "improve the overall quality of life in Coral Gables, Florida; and to provide for efficiency and economy in the process of stable and orderly development, for the appropriate and best use (not necessarily the most economical use) of land in accordance with standards established by the will of the residents, for preservation, protection, development, and conservation of the natural resources of land, water and air, for convenience of traffic and circulation of people and goods, for the use of occupancy of buildings . . . and by

---

[1] Gall also asserts the City illegally confiscated its signs and brochures. However, Gall has presented no record evidence in support of this contention.

2

regulating the location and use of buildings, signs and other structures, and land or water for trade, agriculture, industry and residence." The zoning code also provides that, "In making zoning changes, primary concern shall be given to protection of residential uses, where occupancy is generally for 24 hours per day and 7 days per week, than to other types of uses."

4. Section 3-1 of the City's zoning code expressly provides that "In single-family residence or [Residential Use] Districts no use shall be permitted other than an R-Use and Family Day-Care Home, except that certain special-uses as described in Section 3-11 hereof may be permitted after passage of a special authorizing ordinance thereof. . . . In R-Use Districts no buildings or premises shall be used . . . for a D, A, C, or M-Use as defined herein."[2] There is no ordinance in place that allows for an auction to be conducted on property which is zoned for residential purposes.

5. Section 18-12 of the City's zoning code explicitly prohibits the placement of advertising signs, other than real estate "for sale" signs, on any residential property.

6. The City has deemed auctions of the type conducted by Gall to be a "commercial activity," prohibited in residential areas. Auctions, however, are not prohibited in areas zoned for commercial use.

7. Since 1995, Gall has conducted 13 auctions in the City.

8. Gall purchased signs advertising the availability of homes, and placed the signs in front of the residences to be sold. The signs were manufactured in compliance with City ordinances regulating real estate "for sale" signs. The signs advertised that the properties listed were for sale through Gall as a registered real estate broker and/or that the property might be sold at auction. The

---

[2] The parties have not provided the section of the zoning code that defines the codes "D, A, C, or M-Use."

3

signs have the effect of advertising that the property is for sale to all who pass by the home, and give the appropriate information to the public indicating who is to be contacted if a passerby wishes to register for the auction, find out its terms, or make an offer prior to the auction.

9. Gall would also prepare advertising brochures for the auctions, although the brochures would sometimes only advertise the merchandise to be auctioned and not the home. Gall would mail the brochures to clients, local brokers, and individuals obtained from commercial mailing lists that Gall purchased from other companies.[3] Gall also advertised the auctions in newspapers such as The Miami Herald.

10. To aid in the sale of a residence and/or its contents, Gall developed the "designer package" concept. This means that, at all of the auctions that Gall conducted (and that Gall advertised to be conducted) from private homes in residential areas of the City, Gall auctioned and sold a wide variety of merchandise supplied by various vendors, including but not limited to The Art Collection, Inc., Singh's Gallery, and J. Andres Antiques.

11. Gall earned a commission from the sale of merchandise provided by the vendors (usually 20%). Gall also earned a "buyer's premium" from the sale of each item of merchandise provided by the vendors, which is a percentage added to the top bid (usually 15%). For example, if a buyer bid $100 for a painting sold by The Art Collection, Inc., the buyer would have to pay $115, which would be the $100 bid plus a $15 buyer's premium. Of that sales price, the Art Collection, Inc. would receive $80, and Gall would receive $35 ($20 commission plus $15 buyer's premium). The homeowners did not earn any money from the sale of vendors' merchandise auctioned at their homes.

---

[3] The brochures themselves are not a part of this lawsuit.

4

12. Gall sometimes rented tents, tables, and chairs, and used a public address system to make himself heard for auctions conducted in the driveways, front yards, and back yards in residential areas. Gall also rented trucks or used moving trucks supplied by Ray's Moving (and other such companies) to transport items to the auction and to transport items purchased by customers. Gall would sometimes hire security guards or off-duty police officers to aid with traffic control.

13. On September 30 and October 1, 1995, Gall conducted an auction at 287 Rada Court, a private home in a residential area of the City. Approximately 226 people (at a minimum) attended the auction at the private home over three days. Twenty people worked at the auction. Gall had a "full staff there to help them load their cars or vans or whatever they brought and assist them with the parking." Gall advertised that "854 lots" would be sold, "piece by piece." Gall auctioned, outside, the homeowner's Luhrs yacht for $157,000; Lamborghini automobile for $111,000; and Montero LS automobile for $15,000. In addition, Gall auctioned artwork, signed graphics, furniture, oil paintings, bronzes, jewelry, and other merchandise supplied by various vendors, totaling $178,852. Singh's Gallery alone sold merchandise totaling $30,770. Although the home was also auctioned, it was not sold. Gall earned a $39,110.95 commission from the sale of the merchandise; Gall did not earn a commission from the sale of any real property. There is no evidence that the City interfered with this auction.

14. On March 15 and 16, 1996, Gall conducted an auction at 7521 Los Pinos Boulevard, a private home in a residential area of the City. Approximately 178 people attended the auction over two days. At least 15 people worked at the auction. Gall sold $189,890 worth of merchandise, earning a commission in the amount of $86,302.36. The home itself was not offered for sale.

15. On April 19, 20 and 21, 1996, Gall conducted a second auction at 7521 Los Pinos Boulevard. Approximately 121 people attended that auction over three days. Gall sold $95,707 worth of merchandise, earning a commission of $20,487.94. The home itself was, again, not offered for sale.

16. In April 1996, the City issued three citations against Gall for the April 1996 auction at 7521 Los Pinos Boulevard, for "conducting a business from a residence" in violation of Section 3-1 of the City's zoning code.

17. Gall advertised an auction to take place on July 6 and 7, 1996, at 2908 Alhambra Circle, a private home in a residential area of the City. The auction was subsequently moved to the Biltmore Hotel. None of the personal property advertised for sale at that auction was owned by the homeowner. Gall sold $22,855 worth of merchandise. The home was not sold at the auction. The City did not interfere with the auction conducted at the Biltmore Hotel.

18. On July 13 and 14, 1996, Gall conducted an auction at the Biltmore Hotel, consisting of the homeowner's estate's personal property and merchandise from various vendors. Approximately 205 people attended. The City did not interfere with that auction.

19. In response to Gall's inquiries, the duly-appointed Coral Gables City Attorney advised, in an opinion letter dated May 9, 1997, that while citizens may sell their real or personal property by way of auction, such an auction is "commercial activity" and there is no ordinance in place which allows for the auctions to be conducted on property which is zoned for residential purposes."

20. In August 1997, Gall advertised an auction to take place on September 13, 1997, at 1270 Bird Road, an unfinished home in a residential area of the City. None of the property

advertised for sale was owned by the homeowner. Gall promoted the auction through signs and brochures that advertised the upcoming event.

21.     On or about September 12, 1997, Gall filed the instant action in state court.[4] At the same time, Gall filed, on an emergency basis, a "Verified Motion for Temporary Injunction" to enjoin the City from interfering with the auction scheduled to take place the next day. The state court judge granted the temporary injunction, but only as to the sale of the real property. Gall thereafter moved the auction to the Biltmore Hotel. The City did not interfere with that auction.

22.     The City issued three citations to Gall relating to the sign advertisements for the Bird Road auction, as well as another citation for an auction at 1006 South Greenway Drive, for "advertising in a residential area" in violation of Section 18-12 of the City's zoning code.

23.     On November 22, 1997, Gall conducted an auction at 1116 Asturia Avenue, a private home in a residential area of the City. Gall auctioned only the home, not any merchandise. The City did not interfere in any way with that auction.

24.     There is no evidence that the City ever confiscated any of Gall's signs that complied with City ordinances regarding size and placement, and related solely to the sale of the real property.

25.     There is no evidence that the City confiscated any of Gall's advertising brochures, as opposed to "brochure boxes."[5]

---

[4]  The action was removed to this Court on October 2, 1997, based upon federal question jurisdiction.

[5]  While neither party has defined what a "brochure box" is, the Court presumes the parties are referring to boxes placed in the ground or appended to objects such as mailboxes or trees that hold fliers advertising the auctions. Such boxes would have to meet the parameters of the City's zoning code in order to be acceptable.

## ANALYSIS

The two critical issues the Court must address in order to resolve the cross-motions for summary judgment are: (1) whether Gall's promotional advertising amounts to commercial speech and, if so, is the City's regulation of that speech no broader than necessary to accomplish the City's given objectives of the regulation; and (2) whether the conducting of an auction is "conduct" or "speech" and, if speech, is the City's regulation of that speech no broader than necessary to accomplish the City's given objectives of the regulation?

1.  The Advertising Issue.

At the outset, the Court must determine whether Gall's advertising is protected by the First Amendment. To be protected, the advertising must amount to commercial speech. Commercial speech is an "expression related solely to the economic interests of the speaker and its audience." Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 561 (1980). In essence, commercial speech is speech that "does no more than propose a commercial transaction." Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976). The Court finds that, without doubt, Gall's advertising falls within the ambit of commercial speech. Hence, the speech is protected under the First Amendment, and the Court must now look to the extent that speech can be regulated.

"The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." Central Hudson, 447 U.S. at 563. The law is clear that the government can ban, without penalty, commercial speech that is either deceptive to the public or is related to illegal activity. Id. at 563-64. If the expression is

8

neither misleading or related to unlawful activity, the government's ability to regulate that speech is more limited. Id. at 564. In this case, the Court finds (and the parties agree) that Gall's advertising is neither misleading nor related to illegal activity. Thus, in order to prevail on its motion for summary judgment, the City must establish that it has a substantial interest in regulating Gall's advertising, and that its regulation is proportionate to that interest. See Id.

The City first asserts that it has a valid and substantial interest in maintaining the aesthetics of its neighborhoods, preserving residential tranquility, and regulating the flow of traffic. The Supreme Court and the Eleventh Circuit have explicitly recognized that each of these goals constitutes a substantial government interest. See Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 506-08 (1981); Gold Coast Publications, Inc. v. Corrigan, 42 F.3d 1336, 1347 (11th Cir. 1994), cert. denied, 516 U.S. 931 (1995). The City next asserts that its regulation of advertising in residential neighborhoods directly advances these interests. This argument has already been resolved in the City's favor in Metromedia and, therefore, the Court need not address this issue further. 453 U.S. at 508-12.

Finally, the City argues that its regulation is not substantially broader than necessary to achieve its objectives. The Court agrees. In Metromedia, the ordinance at issue permitted the occupant of a property to advertise goods and services offered at that location; identical billboards advertising goods or services offered elsewhere, however, were prohibited. 453 U.S. at 511. The Supreme Court upheld the ordinance to the extent it treated onsite and offsite commercial speech differently. The Court reasoned that "[i]t does not follow from the fact that the city has concluded that some commercial interests outweigh its municipal interests in this context that it must give similar weight to all other commercial advertising." Id. at 512.

9

In this case, the City has banned all commercial advertising other than signs advertising the sale of a home. The real estate "for sale" signs, however, may only be placed on the homeowner's property and are subject to certain size restrictions. There is no dispute that, to the extent Gall's signs meet these requirements and only advertise the auction of the house and/or the personal property of the owner, its signs fall within the exemption.[6]

The problem here, though, is that Gall also advertises the auction of items not belonging to the home-owner. To this extent, the signs are commercial advertising for which there is no exemption from the ban and the City was well within its rights to cite Gall for the use of such advertising in a residential neighborhood. Notably, the City's regulation does not prohibit Gall from mailing flyers to potential bidders, or from placing his signs in commercially-zoned areas. Thus, the Court finds that, in this instance, the City's restrictions on commercial advertising in residential neighborhoods "reaches no further than necessary to accomplish [the City's] given objective[s]." Id. at 507. Accordingly, summary judgment shall be granted in favor of the City and against Gall on this issue.

2.  The Auction Issue.

The next issue -- the conducting of the auction itself -- is more problematic. The crux of the issue is whether the conducting of an auction is, itself, commercial speech, in that speech is the platform upon which the business of auctioning stands. The parties agree that if an auction is

---

[6] Although the City originally argued in its summary judgment motion that only those signs advertising the auction of real property are allowed, the City retracted from that position at the hearing on the cross-motions and agreed that it would be permissible for Gall to advertise the auction of both the homeowner's real and personal property.

10

deemed conduct and not commercial speech, it is not protected by the First Amendment; if commercial speech, then the Central Hudson test applies.

"In order to determine whether conduct merits protection as speech, a court should inquire (1) whether '[a]n intent to convey a particularized message was present' and (2) whether 'in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.'" Dimmitt v. City of Clearwater, 985 F.2d 1565, 1569 n.2 (11th Cir.1993)(quoting Spence v. Washington, 418 U.S. 405, 410-11 (1974)). Without question, an auctioneer seeks to convey a particularized message -- i.e., the sale of certain products. Because the audience at the auction is normally composed of potential bidders on the products, there is clearly a great likelihood that the audience will (and in fact does) understand the "message" conveyed by the auctioneer. While the exchange of cash for the merchandise after a successful bid may be characterized as conduct, the actual offer to sell is speech. See Nordyke v. Santa Clara County, 110 F.3d 707, 710 (9th Cir. 1997).

In Nordyke, the county sought to prohibit the selling and offering for sale of firearms and ammunition at a gun show held at the county fairgrounds. 110 F.3d at 708. The plaintiffs, the organizers of the gun show, brought suit for First Amendment violations. Id. The county argued that it was merely prohibiting the sale of handguns, and that the sale of handguns was not "speech" within the meaning of the First Amendment. Id. at 710. While the Ninth Circuit agreed that the act of exchanging money for a gun is not "speech" under the First Amendment, it nevertheless noted that the regulation purported to also prohibit the offering for sale of guns. Id. The court thus held that "[a]n offer to sell firearms or ammunition is speech that 'does no more than propose a commercial transaction.' Such an offer is, therefore, commercial speech within the meaning of the

11

First Amendment." Id. at 710 (citing Virginia State Bd. of Pharmacy, 425 U.S. at 762, and Board of Trustees v. Fox, 492 U.S. 469, 482 (1989)). Similarly, the activity of "auctioneering" by its very nature does nothing more than "propose a commercial transaction." Virginia State Bd. of Pharmacy, 425 U.S. at 762.

Moreover, in analyzing cases involving activity somewhat similar to the activity at issue here, courts have generally found the activity to be commercial speech. See, e.g., Fox, 492 U.S. at 473-74 (holding that Tupperware parties "propose a commercial transaction" and, therefore, are commercial speech); Sciarrino v. City of Key West, 83 F.3d 364, 366 (11th Cir. 1996), cert. denied, 519 U.S. 1092 (1997)(holding that regulation of off-premises barkers was the regulation of commercial speech); Project 80's, Inc. v. City of Pocatello, 876 F.2d 711, 714 (9th Cir. 1988)(holding that residential door-to-door solicitation was commercial speech), vacated on other grounds, 493 U.S. 1013 (1990), opinion on remand, 942 F.2d 635 (9th Cir. 1991). But see A.B.C. Home Furnishings, Inc. v. Town of E. Hampton, 947 F. Supp. 635, 643 (E.D. N.Y. 1996)(holding that revocation of permit to conduct tent sale in residential area is regulation of conduct, not speech). The Court cannot find a distinction between the facts of the case *sub judice* and the gun show in Nordyke, the Tupperware sales in Fox, the barkers in Sciarrino, and the door-to-door solicitations in Project 80's, Inc. Thus, for purposes of resolving the cross-motions for summary judgment, the Court finds that the conducting of an auction is commercial speech.

In applying the Central Hudson test with respect to Gall's auctions, the Court first notes that there is no allegation that the auctions are misleading or involve illegal activity. Further, as already established above, the City has a valid and substantial interest in maintaining the aesthetics of its neighborhoods, preserving residential tranquility, and regulating the flow of traffic, and its regulation

of commercial activity (whether it be conduct or speech) is directly related to those interests. Thus, the Court need only address whether the City's regulation of commercial activity in residential areas, as it applies to Gall's auctions, reaches farther than necessary to achieve its goals. See Central Hudson, 447 U.S. at 565-66.

The City's zoning code clearly prohibits the conducting of a business from a residence. The only exceptions that have been made are for the sale of the house itself (including the holding of "open houses" and, apparently, caravans), for use of a house as a day-care center, and for the holding of garage sales. No other uses of residentially-zoned property are allowed unless specifically exempted by the code.[7] To the extent the auction of a home-owner's house and/or the personal belongings of the home-owner is no different than an "open house" or a garage sale, the Court finds that the prohibition of an auction on the home-owner's premises would be overly broad.[8] Here, however, Gall also seeks to sell merchandise belonging to other commercial vendors, for which it gains a monetary reward and the home-owner gains nothing (except for an occasional indirect or intangible benefit). While the City has banned such sales in residential areas, it has in no way interfered with these sales when conducted in commercially-zoned areas. Moreover, the City concedes that there is no prohibition against Gall's "dressing up" a home prior to auction -- the only

---

[7] In this regard, the Court knows of no reason why Gall, along with some of the home-owners, could not petition the City Commission for an exemption for auctions of the type it conducts, and, if allowed, the City could then easily regulate those auctions (i.e., via reasonable time, place, and manner restrictions).

[8] At the hearing on the summary judgment motions, the City retracted its position somewhat, and agreed that Gall would be allowed to auction both the real property and the home-owner's personal property, with the auction occurring at the place of residence. Moreover, there is no evidence in the record that Gall was ever cited by the City for auctions of both real and personal property where the merchandise of other vendors (or Gall's own merchandise) was not involved.

13

prohibition is the sale of the items used to enhance the appearance of the house. Hence, the Court concludes that, to the extent the City prohibits auctions in residential areas when those auctions include the sale of items that are not the property of the home-owner, the regulation is narrowly tailored to achieve the City's goals.

## CONCLUSION

Based upon the foregoing analysis and authorities, it is hereby

ORDERED that Defendant's Motion for Final Summary Judgment [D.E. No. 39] is GRANTED. Final summary judgment shall enter under separate order pursuant to Fed. R. Civ. P. 58. It is further

ORDERED that Plaintiff's Motion for Partial Summary Judgment [D.E. No. 42] is DENIED.

DONE AND ORDERED in Miami, Florida, this 4th day of May, 1999.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Lisa Thomas Rivero, Esq.
Mark A. Deinstag, Esq.
Bret Clark, Esq.